Date signed June 15, 2010



*James F. Schneider*
**JAMES F. SCHNEIDER**
**U. S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| In re: | * | |
| JOSEPH W. JANSSENS, III, | * | Case No. 07-23222-JS |
| Debtor | * | (Chapter 7) |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

| | | |
|---|---|---|
| FREEDOM MEDICAL, INC., | * | |
| Plaintiff | * | |
| v. | * | Adv. Proc. No. 08-0225-JS |
| JOSEPH W. JANSSENS, III, | * | |
| Defendant | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### *MEMORANDUM OPINION GRANTING COMPLAINT TO DETERMINE DEBT TO BE NONDISCHARGEABLE IN THE AMOUNT OF* $189,375.93

The instant complaint to determine nondischargeability of debt came on for trial.  For the reasons stated, the complaint will be granted and a debt in the amount of  $189,375.93, will be determined to be nondischargeable.

***FINDINGS OF FACT***

1.  The plaintiff, Freedom Medical, Inc. ("Freedom," or "the plaintiff"), is a Pennsylvania corporation located in Exton, Pennsylvania, that at all relevant times was engaged in the business of buying, refurbishing, renting and selling biomedical equipment.  Adversary Complaint, ¶¶ 5 and 9.  Freedom was founded in 1997 by Frank Gwynn ("Gwynn"), president, and Dominic Greco ("Greco"), the chief executive officer.  Freedom Medical, Inc. Private Placement Memorandum dated November 1, 2004, at P. 16, Plaintiff's Ex. No. 36.

2.  The debtor/defendant, Joseph W. Janssens, III ("Janssens," or "the defendant") was employed full-time from August 2000 until April 2006, by Freedom as the regional manager of its branch office located in Baltimore, Maryland.

3.  At the time Janssens was hired by Freedom, he signed an employment letter that indicated that customer contacts of Freedom represented confidential proprietary information; the use of which was limited exclusively for the benefit of Freedom.[1]

---

[1]The full text of the employment letter is set forth below:

Dear Joe,

This letter will serve to confirm the terms and conditions of your employment by Freedom Medical, Inc. ("Company").  The Company hereby employs you as a full-time employee to perform services as Regional Manager – Baltimore-Washington branch and Richmond-

2

_____

Tidewater, Va. branch should the Company decide to open a branch office in that area.

Your first day of employment will be August 14, 2000. Your base compensation shall be at the monthly rate of Six thousand dollars ($6,000.00) for the first month of employment, Five thousand five hundred dollars ($5,500.00) for the second month, Five thousand dollars ($5,000.00) for the third month and Four thousand one hundred sixty-seven dollars ($4,167.00) for the fourth month and for each month thereafter, payable every two weeks.

You will also be entitled to receive incentive compensation of Five per cent (5%) of the gross rental revenues, net of revenue adjustments of all rental revenues in your territory.

In addition, you will also receive an additional five per cent (5%) of the gross profits pertaining to all sales generated in the territory which has been developed by you.

You will also receive health insurance and other benefits as an employee of the Company in accordance with Company policy.

During the course of your employment, you will have access to, and become familiar with confidential information of the Company. You acknowledge that such confidential information is proprietary to the Company. You will not, either during the term of your employment and at any time following the termination of your employment, for any reason, disclose and/or divulge any such information for any purpose whatsoever. For purposes hereof, the term "confidential information" shall mean any information or data used by or belonging to Company that is not known generally to the industry including, without limitation, any and all trade secrets, proprietary information relation to Company's business, costs, prices, clients or customers, or list thereof, processes, procedures or standards, manuals, business strategies, records, drawings, specifications, designs, or financial information, whether or not reduced to writing.

3

4.  Freedom also advised Janssens that the company's employee handbooks and its acceptable use policy described such information as proprietary information to Freedom.  Freedom Medical, Inc. Employee Handbook, Plaintiff's Ex. No. 4-6; Freedom Medical, Inc. Acceptable Use Policy, Plaintiff's Ex. No. 8; and Acknowledgment by Janssens of receipt of Freedom Medical Employment Policies, Plaintiff's Ex. No. 2.

5.  Janssens also entered into an agreement with Freedom entitled "Non-Disclosure, Non-compete, Property Rights Agreement" dated August 28, 2001, Defendant's Ex. No. 2.[2]

---

In consideration of your employment, you agree that should you terminate employment either voluntarily or involuntarily by the Company, you will not solicit any existing customers or employees for a one year period thereafter, provided the foregoing shall have no force and effect and shall have no application in the event your employment is terminated by reason of the Company's going out of business, going into bankruptcy or ceasing to conduct business in the Baltimore-Washington-Richmond area as contemplated as a part of your employment.

Employment letter from Gwynn to Janssens, with handwritten changes acknowledged by Janssens, dated July 24, 2000, Plaintiff's Ex. No. 1.

[2]The Agreement provided in its entirety, as follows:

NON-DISCLOSURE, NON-COMPETE, AND PROPERTY RIGHTS AGREEMENT

This AGREEMENT is made this 28th day of August, 2001, between FREEDOM MEDICAL, INC., a Pennsylvania corporation with its

4

principal place of business located at 208 Carter Drive, Suite 20, West Chester, Pennsylvania 19382 ("Freedom Medical") and the undersigned individual ("Individual"), a key officer, director, employee, agent, or subcontractor of Freedom Medical.

WHEREAS, the promises and covenants of, and restrictions and requirements on, Individual contained in this Agreement are a reasonable and necessary protection of the legitimate interests of Freedom Medical.

WHEREAS, as a condition and in consideration of Individual participating in that certain Freedom Medical Equity Participation Plan, Individual has agreed to be bound by the promises, covenants, restrictions and requirements contained herein.

NOW, THEREFORE, the parties hereto, intending to be legally bound hereby, for good and valuable consideration, receipt of which is hereby acknowledged, agree upon the following terms and conditions concerning the matters described herein:

1. *Disclosure of Information.* During Individual's engagement by and association with Freedom Medical, Individual will have access to certain information not generally known to the public or the competitors of Freedom Medical relating to the business, customers, employees, sales data, policies and procedures, and marketing strategies of Freedom Medical, including, but not limited to, information concerning Freedom Medical's sales, sales volume, sales methods, sales proposals, customers and prospective customers, identity of customers and prospective customers, identity of key purchasing personnel in the employ of customers and prospective customers, pricing formulae, current or future marketing strategies, amount and/or kind of customers' purchases, sources of supply, key contacts in sources of supply, computer programs, system documentation, special hardware, products hardware, manuals, formulae, processes, methods, machines, ideas, improvements and/or other proprietary and confidential information belonging to Freedom Medical or relating to Freedom Medical's affairs (collectively, "Confidential Information"). Such Confidential Information constitutes

5

a valuable asset of Freedom Medical. Individual understands and agrees that Individual's engagement by and association with Freedom Medical creates a relationship of trust and confidence between Individual and Freedom Medical with respect to the Confidential Information. With respect to the Confidential Information, Individual agrees as follows:

(i)  Individual acknowledges that all Confidential Information is the confidential and exclusive property of Freedom Medical and may not be disclosed to anyone for any purpose whatsoever except to employees of Freedom Medical in furtherance of Freedom Medical's business. Individual shall not at any time, whether during or after termination of Individual's engagement by Freedom Medical, disclose to any person or entity any of the Confidential Information, and Individual shall not permit any person or entity to examine and/or make copies of any documents that contain or are derived from Confidential Information, whether prepared by Individual or otherwise coming into Individual possession or control, without the prior written consent of Freedom Medical. Individual shall not make any use of Confidential Information except in the discharge of Individual's obligations and duties while engaged by Freedom Medical. Individual shall limit any permitted disclosure to such employees of Freedom Medical who are directly involved with the work done by or on behalf of Freedom Medical and then only to the extent that is necessary and essential for the performance of the work. Proper and appropriate steps shall be taken and maintained by Individual at all times to protect the Confidential Information. The foregoing requirements as to confidentiality and nondisclosure shall not apply to information that is in the public domain or becomes part of the public domain through no fault of Individual or that is in Individual's possession prior to receipt from Freedom Medical.

(ii)  All documents, records, apparatus, equipment, and other physical property, including, without limitation, all copies, writings, drawings, or data comprising or derived from such information, and any transcriptions or notes concerning any such information that was communicated orally, whether or not pertaining to the Confidential Information, furnished to Individual by Freedom Medical, or produced by Individual or others in

6

connection with their engagement by or on behalf of Freedom Medical shall be and remain the property of Freedom Medical solely and shall be returned to Freedom Medical immediately as and when requested by Freedom Medical. Even if Freedom Medical does not so request, Individual shall return and deliver all such property to Freedom Medical upon termination of Individual's engagement or expiration of any agreement for Individual's engagement and Individual shall not take with it any property or any reproduction of such property upon such termination or expiration.

*2. Restrictive Covenants.*

2.1. During the period that Individual is engaged by Freedom Medical to render services and for a period of one (l) year after the termination of Individual's engagement for any reason whatsoever (including, without limitation, a termination initiated by either Individual or Freedom Medical, with or without cause, by resignation or otherwise) ["Period of Non-Competition"], Individual covenants and agrees that Individual shall not, without the prior written consent of Freedom Medical, directly or indirectly, whether alone or as a partner, joint venturer, franchisee, franchisor, officer, director, employee, independent contractor, employer, consultant, agent, shareholder, member or in any other capacity or manner whatsoever, for his own account or for the benefit of any person or entity, engage ID, conduct and/or solicit any business within the Restricted Area (defined below) which is similar to, in competition with or the same as the Business of Freedom Medical (defined below). The term "Business of Freedom Medical" shall mean all businesses of Freedom Medical and its affiliates, whether presently conducted or hereafter engaged in or contemplated by Freedom Medical or any affiliate at any time during the term of Individual's engagement involving the research, development, engineering, integration, manufacture, production, purchasing, leasing, and/or selling of emergency medical equipment and supplies, such as (without limitation) defibrillators, patient monitors, infusion therapy devices, and other emergency medical equipment and supplies, and related concepts, plans, or processes. The term "Restricted Area" shall mean and include:

7

(i) the geographic area that falls within a seventy-five (75) mile radius of any office of Freedom Medical that the Individual is, directly or indirectly, working from or has worked from within a one (1) year period of the termination date of such Individual's services, and/or (ii) any geographic area from which such Individual has, directly or indirectly, solicited sales or assisted others in the solicitation of sales on behalf of Freedom Medical, whether as a sales representative, sales manager or otherwise.

2.2. During the Period of Non-Competition, Individual covenants and agrees that Individual shall not, without the prior written consent of Freedom Medical, directly or indirectly, for himself or on behalf of or in conjunction with others (i) solicit, induce, divert, employ, engage or otherwise interfere with any of Freedom Medical's employees or consultants or to solicit and/or induce any such employees or consultants to leave the employ or engagement of Freedom Medical or to work for Individual or any person with whom Individual is associated, and/or (ii) solicit, attempt to solicit, aid in the solicitation or service in any way, or otherwise do business with any customer, potential customer, vendor or supplier of Freedom Medical so as to offer, sell or provide any product or services that would be competitive with any products or services sold or provided by Freedom Medical during the period that Individual is engaged by Freedom Medical, or any products or services that Individual knows are being developed or offered by Freedom Medical during such period that Individual is engaged by Freedom Medical, and/or (iii) attempt to persuade such customer, potential customer or vendor to discontinue its relationship with Freedom Medical.

3. *Intellectual Property, Inventions, and Discoveries.*

3.1. Individual agrees that all ideas, designs, discoveries, inventions and improvements, and all literary or graphic material, relating to the Business of Freedom Medical or relating to any other subject matter which comes to Individual's attention by virtue of Individual's association with Freedom Medical, shall be the sole and exclusive property of Freedom Medical, and Individual shall have no right, title,

or interest in any such material. Such material shall be referred to herein as "Developments" and shall include, without limitation, any research, development, or experimental work, carried on by Freedom Medical, any problem specifically assigned to Individual, or any know-how or techniques, any of which are conceived, developed, written, prepared, or revised by Individual alone or in conjunction with others during the term of Individual's engagement by and association with Freedom Medical, whether or not during Individual's regular working hours and whether or not on Freedom Medical's premises.

3.2. Individual shall promptly disclose and assign to Freedom Medical, in writing, any and all ideas, designs, improvements, discoveries, and inventions that Individual makes or conceives, solely or jointly with others, either during or outside the term of Individual's engagement with Freedom Medical (a) using Freedom Medical's equipment, supplies, facilities, or trade secret information, or (b) that relate, at the time of conception or reduction to practice, to the Business of Freedom Medical, or to actual or demonstrably anticipated research or development at Freedom Medical, or (c) that result from any work Individual performs for or on behalf of Freedom Medical. In all cases, such execution of such applications and assignments and assistance shall be provided at no cost to Freedom Medical, except that Freedom Medical shall reimburse Individual for Individual's costs or expenses necessarily incurred incident to Freedom Medical's requests pursuant to this provision.

3.3. Whenever requested to do so by Freedom Medical, at Freedom Medical's expense, Individual shall: (i) assist Freedom Medical and its agents in preparing patent applications in all countries of the world relating to any improvement, discovery, and/or invention covered by this Section; (ii) assist Freedom Medical and its agents in securing for Freedom Medical and/or its nominee(s) the sole and exclusive right, title, and interest in and to any such improvement, discovery, and/or invention; (iii) sign and deliver to Freedom Medical all papers necessary thereto, including assignments of patent applications and patents; and, (iv) give all information and testimony, sign all papers, and do all things which may be needed or requested by Freedom Medical to obtain,

9

extend, reissue, maintain or enforce such patents. When any assistance relating to such patents or patent applications is rendered after the Employment Period, Freedom Medical will pay Individual a reasonable sum, as determined by Freedom Medical, for Individual's time and expenses.

3.4.  Freedom Medical, as the absolute and unqualified owner of all literary or graphic material referred to in subparagraph 3.A above, including, without limitation, any computer software, shall have the right to obtain copyrights, copyright renewals, and such other protection therefor as Freedom Medical deems reasonable. Individual agrees to execute and deliver such other instruments and documents as Freedom Medical may deem necessary or advisable to evidence, establish, maintain, or defend Freedom Medical's rights in or to such material. Any Development that must be assigned to Freedom Medical pursuant to this Section 3 is the sole and exclusive property of Freedom Medical, regardless of when the improvement, discovery, or invention was made or conceived.

3.5.  In the event that Freedom Medical is unable, for any reason whatsoever, to secure Individual's signature on any letters patent, copyright, or analogous protection relating to any Development (including applications, renewals, extensions, continuations, and divisions), Individual hereby irrevocably designates and appoints Freedom Medical and its duly authorized officers and agents as Individual's agent and attorney-in-fact, to act for, and on behalf or instead of, Individual to execute and file any such application (or otherwise) and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent, copyright, or other analogous protection thereon with the same legal force and effect as if executed by Individual.

*4. Remedies.*

4.1.  Freedom Medical and Individual agree and stipulate that the agreements and covenants of Individual as set out above in Sections 1,

10

2 and 3 (hereinafter collectively referred to as the "Covenants") are fair and reasonably necessary for the protection of the business, goodwill, trade secrets and other protectable interests of Freedom Medical in light of all of the facts and circumstances of the relationship between Individual and Freedom Medical.

4.2.  Individual agrees that, in the event Individual breaches or threatens to breach anyone, some or all of the Covenants, Freedom Medical shall be entitled to both a preliminary or permanent injunction to prevent the continuation of such harm.  Nothing contained herein shall be construed to prohibit Freedom Medical from also pursuing any other remedies, the parties having agreed that all remedies shall be cumulative.  The existence of any claim, demand, action or cause of action by Individual against Freedom Medical, whether predicted upon this Agreement or otherwise, shall not constitute a defense to the enforcement by Freedom Medical of any of its rights hereunder, including, without limitation, its rights to enforce the Covenants.

4.3.  If Individual violates anyone, some or all of the Covenants and Freedom Medical brings legal action for injunctive or other relief, or if such Covenants are otherwise the subject to litigation between the parties, Freedom Medical shall not, as a result of the time involved in obtaining such relief, be deprived of the benefit of the full period of the Period of Non-Competition.   Accordingly, the Period of Non-Competition shall be deemed to have the duration specified in Section 2 above, computed from the date such relief is granted, but reduced by the time expired between the date the period of restriction began to run and the date of the first violation of the Covenant by Individual.

4.4.  If any portion of the Covenants and agreements contained herein, or the application thereof, is construed to be invalid or unenforceable, then the other portions of such Covenants or agreements, or the application thereof, shall not be affected and shall be given full force and effect without regard to the invalid or unenforceable provision.  If any court or agency shall determine that the scope, duration or geographical limits of any Covenants contained in Section 2 are unenforceable, it is

11

the intention of the parties that the Covenants set forth therein shall not thereby be terminated, but shall be deemed amended to the extent required by such court and/or agency to render it valid and enforceable.

4.5.  The parties further agree that a breach of any agreement, whether written or oral, between or among Individual and Freedom Medical, or any other actionable conduct by Freedom Medical, or any defense, set-off or counterclaim by Individual against Freedom Medical, or any other related rights of Individual against Freedom Medical will have no affect on any or all of the terms and provisions of Sections 2, 3 and 4 of this Agreement.  The terms and provisions of Sections 2, 3 and 4 shall remain in full force and effect for the benefit of Freedom Medical, and its successors or assigns, regardless of any such breach, actionable conduct, set-off, defense or counterclaim.

4.6.  Individual shall reimburse Freedom Medical for all costs, fees and other expenses incurred by Freedom Medical in connection with Freedom Medical's attempt to enforce the provisions of this Agreement, whether or not suit is actually instituted, together with Freedom Medical's reasonable attorney fees and costs incurred in connection therewith.

*5.  Miscellaneous.*

5.1.  Individual intends that the rights and obligations created by this Agreement shall survive the expiration or termination for any reason of Individual's engagement and/or association with Freedom Medical. Further, Individual agrees that Freedom Medical may assign any portion or all of this Agreement to its successors and assigns including, without limitation, any successors and/or assigns arising from the sale and/or merger of Freedom Medical, whether or not Freedom Medical is the surviving entity.

5.2.  If any provision of this Agreement shall be held invalid or unenforceable, the remainder of this Agreement shall, nevertheless, remain in full force and effect.  If any provision is held invalid or

unenforceable with respect to particular circumstances, it shall, nevertheless, remain in full force and effect in all other circumstances.

5.3. This Agreement shall inure to and shall be binding upon the parties hereto, the successors and assigns of Freedom Medical and the heirs and personal representatives of Individual.

5.4. The waiver by either party of any breach or violation of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach or violation hereof.

5.5. This Agreement shall be construed in accordance with the laws of the Commonwealth of Pennsylvania without regard to internal conflict of law principles. Any suit, action or proceeding concerning any disputes, controversies, or claims arising out of or relating to this Agreement, including any claims, disputes or controversies arising in tort or contract and whether under state or federal law (collectively the "Dispute"), shall be instituted with a state or Federal Court of competent jurisdiction located in Philadelphia, Pennsylvania and each party irrevocably submits to the jurisdiction and venue of such court for such purposes. Notwithstanding the above, Freedom Medical shall have the right, exercisable in its sole discretion, to resolve any Dispute, whether initiated by Individual or Freedom Medical, by final and binding arbitration held in Philadelphia, Pennsylvania, under the rules of the American Arbitration Association.

5.6. This Agreement contains the entire agreement between the parties hereto. No change, addition, or amendment shall be made except by written agreement signed by the parties hereto.

5.7. Individual agrees that Freedom Medical may assign any portion or all of this Agreement including, without limitation, the Covenants, to its successors or assigns including, without limitation, any successors and/or assigns arising from the sale and/or merger of Freedom Medical, whether or not Freedom Medical is the surviving entity.

6. In 2004, Freedom began to experience declining revenue. The revenue of the Baltimore branch which Janssens managed declined from $1.5 million in 2003 to $1.1 million by 2006. Affidavit of Frank Gwynn dated March 30, 2007, at 4, Defendant's Ex. No. 32.

7. On December 29, 2004, Freedom filed a voluntary Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Eastern District of Pennsylvania, Case No. 04-37092-BIF. During the pendency of the Chapter 11 proceeding, Freedom neither assumed nor rejected the agreements with Janssens. The case was closed on June 21, 2006.

8. Gwynn and Greco investigated the reasons for the diminution in Freedom's revenue. Between 2004 and 2006, they met with Janssens in an attempt to determine the reasons for the decline. Transcript, P. 42, line 10 [P. 72]. At a meeting in the summer of 2005, they asked Janssens directly whether he was working outside of the business, which Janssens denied and said that he was "trying his best to build the business of Freedom Medical." Transcript, p. 45, lines 16-24 [P. 72]. As a result of these and other meetings Gwynn came to believe that Janssens was "asleep at the wheel." Transcript, 46, line 20 [P. 72].

---

Non-Disclosure, Non-compete, Property Rights Agreement dated August 28, 2001, Defendant's Ex. No. 2.

14

9.   In 2006, based upon the decline of sales at the Baltimore branch, Gwynn and Greco concluded that Janssens was "completely inattentive to the business, and he needed to be replaced."   Transcript, 54, lines 20-21 [P. 72].  On April 7, 2006, Freedom terminated Janssens' employment.  Transcript, 55, line 25 [P. 72].

10.   In May 2006, Freedom learned that items of its equipment that was missing was being rented by another entity that employed some of Freedom's former employees.  Transcript, 56, lines 6-9 [P. 72].  Freedom hired a private investigator to investigate possible wrongdoing by its employees and former employees.  Transcript, PP. 56-57, lines 16-19 [P. 72].  During the course of the investigation, Janssens' replacement as supervisor of the Baltimore branch learned that Janssens had been diverting business from Freedom to its competitors.  The investigation disclosed that in 2004, Janssens began diverting corporate opportunities by using the customer contacts of Freedom and conveying those business leads to Quality Medical South[3] and Quality Medical Group (collectively referred to hereafter as "Quality").  Evidence disclosed a pattern of misconduct whereby Janssens solicited business from customers of Freedom on behalf of Quality and sold or rented equipment to them.  Transcript, 70-71, lines 11-14 [P. 72].

---

[3]According to the complaint, Quality Medical South, Inc. is defunct and is now trading and operating as "Quality Medical Rentals, LLC."  Complaint, ¶ 8, n.1.

15

11. In July 2006, Freedom sued Janssens and 22 other defendants in the United States District Court for the Eastern District of Pennsylvania in a suit styled *Freedom Medical, Inc. v. Gillespie, et al.*, Case No. 06-3195 ("Suit No. 1"), in which Freedom charged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), conspiracy, fraud and breach of fiduciary duty. Suit No. 1 was dismissed against Janssens at summary judgment "without prejudice for lack of jurisdiction." Memorandum and Order dated September 14, 2007 in *Freedom Medical, Inc. v. Gillespie, et al.*, Case No. 06-3195, Plaintiff's Ex. No. 30.

12. During the pendency of Suit No. 1, Janssens acknowledged in a deposition that he was aware that any work he performed for another entity while he was employed by Freedom should have been disclosed to Freedom. Deposition Transcript of Joseph Janssens dated February 26, 2007, taken in *Freedom Medical, Inc. v. Gillespie, et al.*, Case No. 06-3195, at 54, lines 6-15, Plaintiff's Ex. No. 3. Janssens admitted that his supervisors at Freedom would not have been "thrilled about it" and would not "have agreed with my assessment" that diverting corporate opportunities actually helped Freedom. *Id*. at 57, lines 9-19.

13. Freedom alleged that from March 1, 2004, until Janssens was terminated in April 7, 2006, he diverted approximately $649,407.81 worth of business from Freedom to Quality. From March 1, 2004, until April 7, 2006, Freedom paid Janssens

16

$189,375.93, in salary and commissions. Janssens' W-2 Forms for 2004, 2005 and 2006, Plaintiff's Ex. No. 10. Quality paid Janssens commissions at rates ranging from 5% to 10% on gross revenues generated from the various transactions he conducted on behalf of Quality. Rule 26 Disclosures of Quality Medical Group, Inc., with attachments, filed in *Freedom Medical, Inc. v. Janssens, et al.*, Case No. 07-4286, Plaintiff's Ex. No. 4-8. These commission rates were paid at a rate greater than that paid to Janssens by Freedom. Transcript, 74, lines 12-25 and 79, lines 1-2 [P. 72].

14. Janssens admitted diverting corporate opportunities from Freedom to Quality. Deposition Transcript of Janssens, dated September 26, 2008, taken in the instant adversary proceeding with exhibits, at 76, lines 1-7; 82, lines 19-21; and at 83, lines 1-9, Plaintiff's Ex. No. 4. Janssens claimed that in so doing, he was protecting Freedom by diverting to Quality those types of business or services in which Freedom was either not interested or was unable to perform.

15. Freedom disputed this assertion. Eric Wenzel ("Wenzel"), Chief Financial Officer of Freedom, testified that between 2004 and 2006, Freedom had between 25,000 and 27,000 pieces of biomedical equipment to meet their clients' rental needs. Transcript, 16, lines 22-25 and 17, lines 1-10 [P. 73]. During this period, Freedom's biomedical equipment had a utilization rate of between 38% and 43%. In cases where an item of equipment could not be found at the local branch, Wenzel testified that

17

Freedom had a procedure whereby salespersons were directed to contact the company's asset management department, which in turn would locate or purchase the requested items. Transcript, 36, lines 20-25 and 37, lines 1-14 [P. 73]. Janssens did not follow the procedure. At trial, on the issue of a standard rental where the equipment might have been in Freedom's inventory but could not be found locally, Janssens could not recollect one instance where management was unable to meet the client's needs. Transcript, 202, lines 11-15 [P. 73].

16. Contrary to Janssens' assertion that Freedom was no longer interested in servicing its clients' medical equipment, Freedom offered its Preliminary Private Placement Memorandum ("PPPM") to potential investors, which stated: "We provide a full range of biomedical equipment related to services, including equipment delivery, inspection, maintenance, preventative maintenance, logistical services, repair, and documentation." PPPM dated November 1, 2004, at 30, Plaintiff's Ex. No. 36. The PPPM also described the Freedom support staff associated with these services, including "18 sales representatives, 15 customer service representatives and 42 biomedical technicians." *Id.* As of August 31, 2004, Freedom attributed 5.7% of its revenue to the servicing of biomedical equipment. *Id.* at A-3.

17. In December 2004, Janssens diverted a $90,000 sale of medical equipment for Integrated Medical Systems ("IMS") to Quality. Purchase order dated December

18

29, 2004, Plaintiff's Ex. No. 42.  In his deposition taken in Suit No. 1, Janssens testified that Mr. Pat Dorio of IMS "made it pretty clear that he wouldn't do business with Freedom Medical."  Deposition Transcript of Janssens dated February 26, 2007, at 140, lines 2-22, Plaintiff's Ex. No. 3.  However, during the trial of the instant complaint, Janssens testified that he contacted Freedom's management about a big order, but never received a response.  Transcript, 197, lines 1-11 [P. 73].  Having heard nothing from management, Janssens testified that he believed it was permissible to forward IMS information to Quality to see if it was interested.  Transcript, 197, lines 1-19 [P. 73].

18.  On December 27, 2007, Freedom filed a second suit in the United States District Court for the Eastern District of Pennsylvania, styled *Freedom Medical, Inc. v. Joseph W. Janssens, Quality Medical Group, Inc. and Quality Medical South, Inc.*, Case No. 07-4286 ("Suit No. 2"), in which it alleged fraud, misappropriation of trade secrets and breach of fiduciary duty.

19.  On December 28, 2007, one day after the suit was filed, Janssens filed the instant voluntary Chapter 7 bankruptcy petition in this Court, thus staying Suit No. 2 against Janssens only.

20.  On March 31, 2008, Freedom filed the instant adversary proceeding against Janssens in this Court to determine nondischargeability of debt.

19

21.  Freedom alleged in its complaint that as a direct and proximate cause of Janssens' misrepresentations, omissions, and/or concealment of material facts, Freedom was damaged in an amount equal to the value of the compensation paid to Janssens, the fair market value of all lost revenue and profits, lost business opportunities, damage to business reputation and relationships; and because Janssens' conduct was knowing, intentional, willful, wanton and reckless, that Freedom was entitled to an award of punitive damages.  Complaint, ¶ 31.

22.  On May 19, 2008, Janssens filed an answer [P. 7] to the complaint, in which he denied all material allegations and asserted both affirmative defenses and a counterclaim against Freedom.

23.  The affirmative defenses asserted by Janssens were that (1) because Freedom did not assume any contracts with Janssens during the pendency of its Chapter 11 bankruptcy case, the employment contracts with Janssens were deemed rejected; (2) Freedom failed to disclose its claims against Janssens in its Chapter 11 bankruptcy filings; (3) Freedom's claims against Janssens "are for an improper purpose;" (4) the agreements between Freedom and Janssens were unenforceable for lack of consideration, breach by the plaintiff, and/or because the agreements were either rejected in Freedom's Chapter 11 bankruptcy case or because their enforcement is barred by operation of law due to the failure to disclose the claims in the bankruptcy

20

proceeding; (5) Janssens performed his contractual obligations to the plaintiff; (6) the claims are barred by the doctrines of impossibility of performance, impracticability, frustration of purpose and modification; (7) the claims are barred by the doctrines of waiver, laches, estoppel, equitable estoppel and judicial estoppel; (8) the claims are barred by the doctrine of unclean hands including Freedom's failure to report income and concealment of assets during its bankruptcy proceeding; (9) the plaintiff failed to mitigate its damages, if any; (10) any damages or loss suffered by the plaintiff were caused by its own acts, omissions and/or conduct of parties other than Janssens; (11) the claims are barred because any damages were the result of intervening factors and not by any acts or omission of Janssens; (12) the claims are barred because any damages sustained by the plaintiff were caused by non-parties to this action over whom Janssens had no authority and/or control; (13) the claims are barred because plaintiff contributed to and/or assumed the risk of any alleged losses; (14) Janssens acted in good faith and for a permitted purpose; (15) the claims are barred because Janssens' actions were proper, privileged, justified and undertaken in good faith; (16) the claims are barred by limitations; and (17) the claims are barred by the doctrines of consent, approval, direction, ratification, novation, and/or acquiescence to the transactions at issue.  Answer, Affirmative Defenses And Counterclaim, ¶¶ 1-17.

24.   Janssens' four-count counterclaim against Freedom alleged defamation, tortious interference with business relations, breach of the covenant of good faith and fair dealing and abuse of process.

25.   On April 11, 2008, Joseph J. Bellinger, the Chapter 7 trustee in Janssens' bankruptcy case, filed a report of no distribution.

26.   On May 22, 2008, Quality settled Suit No. 2 with Freedom for $50,000. Settlement Agreement in Freedom Medical II, Defendant's Ex. No. 17.

## *CONCLUSIONS OF LAW*

### SUBJECT MATTER JURISDICTION AND VENUE

1.   The instant complaint requesting the allowance of a claim and the determination of the nondischargeability of debt is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(B) and (I) over which this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334.  Venue is appropriate pursuant to 28 U.S.C. § 1409.

### JANSSENS' DEFENSES AND COUNTERCLAIMS WILL BE DENIED

### THE RESTRICTIONS AGAINST COMPETITION IN THE DEBTOR'S EMPLOYMENT AGREEMENT WERE NOT REJECTED IN FREEDOM'S CHAPTER 11 BANKRUPTCY CASE

2.  The debtor's contention is without merit that the noncompetition clause in his employment agreement is unenforceable because the employment agreement was an executory contract that was not assumed by Freedom in its Chapter 11 bankruptcy.  In *Cinicola v. Scharffenberger*, 248 F.3d 110, 119 (3d Cir. 2001), the Third Circuit Court of Appeals held in a Pennsylvania case that a noncompetition covenant contained in certain employment agreements that were rejected in bankruptcy continued in effect because they remained enforceable under state law, citing *In re Steaks to Go, Inc.*, 226 B.R. 35 (Bankr. E.D. Mo. 1998) and *Kwik-Kopy Corp. v. Klein (In re Klein)*, 218 B.R. 787 (Bankr. W.D. Pa. 1998); *see also Sir Speedy, Inc. v. Morse,* 256 B.R. 657 (D. Mass. 2000).  In *Diamond Z Trailer, Inc. v. JZ L.L.C. (In re JZ L.L.C.)*, 371 B.R. 412, 418-419 (BAP 9th Cir. 2007), the Ninth Circuit Bankruptcy Appellate Panel held that  in a Chapter 11 case after a plan was confirmed and the case was closed, an executory contract that was unscheduled in the case remained property of the bankruptcy estate and revested in the reorganized debtor, pursuant to Section 554(d) of the Bankruptcy Code, and that the reorganized debtor had standing to sue on the contract and was not prohibited from doing so by judicial estoppel in the absence of proof that the debtor was not taking undue advantage of the adverse party and its failure to schedule the contract was an innocent omission.  This appears to be the situation in the instant complaint, where the debtor has failed to prove an intentional failure by Freedom to schedule the

23

employment contract in Freedom's Chapter 11 case and the contract remains enforceable pursuant to Pennsylvania law.

## COLLATERAL ESTOPPEL

3.   The purpose of collateral estoppel is to prevent "the relitigation of issues of fact or law that are identical to issues which have been actually determined and necessarily decided in prior litigation in which the party against whom issue preclusion is asserted had a full and fair opportunity to litigate." *Ramsay v. U.S.I.N.S.*, 14 F.3d 206, 210 (4th Cir. 1994).  *See also Gulati v. McClendon (In re McClendon),* 415 B.R. 170, 180 (Bankr. D. Md. 2009).  Collateral estoppel will only apply if the following five elements are proven: "(1) the issue precluded must be identical to one previously litigated; (2) the issue must have been actually determined in the prior proceeding; (3) determination of the issue must have been a critical and necessary part of the decision in the prior proceeding; (4) the prior judgment must be final and valid; and (5) the party against whom estoppel is asserted must have had a full and fair opportunity to litigate the issue in the previous forum."  *Ramsay*, 14 F.3d at 210 (citing *Coffey v. Dean Witter Reynolds, Inc*., 961 F.2d 922, 925 (10th Cir.1992)); *Central Transport, Inc. v. Four Phase Systems*, Inc., 936 F.2d 256, 259 (6th Cir. 1991).  *See also Muse v. Day (In re Day)*, 409 B.R. 337, 342 (Bankr. D. Md. 2009).  "Collateral estoppel is applicable in

discharge exception proceedings." *Grogan v. Garner*, 498 U.S. 279, 284-85, 111 S.Ct. 654, 658-59, 112 L. Ed.2d 755, 763-64  (1991).

4. Janssens raised the affirmative defense that Freedom was collaterally estopped from bringing this complaint based upon fraud because Suit No. 1 brought against him by Freedom was dismissed.[4]  However, in the instant case, all five elements required in order for collateral estoppel to apply cannot be established because the earlier suit did not determine the issue of fraud.  In Suit No. 1, the court stated:

> The Court does not reach the merits of the cross-motions for summary judgment on Freedom's state law claims, but dismisses them without prejudice for lack of jurisdiction.  The Court finds that these claims do not form part of the same case or controversy as the remaining federal claims against the other and that, therefore, this Court lacks supplemental jurisdiction over them.

Memorandum and Order dated September 12, 2007 in Suit No. 1, Plaintiff's Ex. No. 30, pp. 2-3.  Because the court granted Janssens' summary judgment motion on two RICO counts and dismissed them with prejudice, Freedom is collaterally estopped from bringing a subsequent suit against Janssens on a RICO theory.  However, as noted above, summary judgment was not granted as to other counts that alleged common law

---

[4]Janssens cited *Reliance Ins. Co. v. Miller,* 144 Fed. Appx. 966 (4th Cir. 2005), for the proposition that collateral estoppel bars the instant suit.  However, *Reliance* is inapposite because there the debtors were estopped from relitigating the issue of whether they had committed fraud because the issue had already been determined on the merits in the State court.  *Id.*

fraud, breach of fiduciary duty, misappropriation of trade secrets, or any of the other state law claims.  Because collateral estoppel only prevents the relitigation of issues that were actually litigated in a previous action, the doctrine is not applicable to the issues raised by the plaintiff in the instant adversary proceeding because those issues have never been actually determined in any prior proceeding.

## JUDICIAL ESTOPPEL

5.  "The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding."  *New Hampshire v. Maine,* 532 U.S. 742, 749, 121 S.Ct. 1808, 1814, 149 L. Ed.2d 968 (2001) (quoting 18 C. Wright, A. Miller, & E. Cooper, FEDERAL PRACTICE AND PROCEDURE § 4477, p. 782 (1981)).  The purpose of the doctrine is to prevent the manipulation of the judicial process.  *Id.,*  532 U.S. at 750, 121 S.Ct. at 1814.  *See also Miller v. Cigna Insur. Co.*, 311 B.R. 57, 62 (D. Md. 2004).  To establish judicial estoppel, one must prove three elements, namely, "first, the party in question must have adopted irreconcilably inconsistent positions; second, the party must have adopted these positions 'in bad faith;' and third, there must be a showing that judicial estoppel is tailored to address the harm and that no lesser sanction would be sufficient."  *Chao v. Roy's Constr., Inc.*, 517 F.3d 180, 186 n. 5 (3d Cir. 2008), (citing *Krystal*

*Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F. 3d 314, 319-320 (3d Cir. 2003)).

6.  Janssens asserted that Freedom was judicially estopped from bringing this lawsuit because the schedules filed by Freedom in its Chapter 11 bankruptcy proceeding did not include a potential claim against him.   However, Janssens has failed to demonstrate that Freedom has taken inconsistent positions.   While Freedom did not disclose a potential claim against him in its bankruptcy filings, Janssens has not shown that Freedom was aware of any possible claims against him when its bankruptcy petition was filed.   The earliest time at which Freedom might have been aware of a claim against Janssens was April 2006, the date it fired him two months before Freedom emerged from bankruptcy.   Freedom did not begin investigating Janssens and other Freedom employees until May 2006.   Gwynn and Greco fired Janssens because they thought he was inattentive to the business and not because he was diverting corporate opportunities.   Therefore, it is unlikely that Freedom was aware of possible claims against Janssens before its bankruptcy case was closed, and no evidence has been brought to prove otherwise.   Therefore, Freedom's current position is not inconsistent with its position during its bankruptcy proceedings.

7.  In addition, Janssens has produced no evidence that Freedom has changed positions in bad faith.  Accordingly, Freedom was not judicially estopped from bringing and maintaining the instant adversary proceeding.

## ABUSE OF PROCESS OR WRONGFUL USE OF CIVIL PROCEEDINGS

8.  Janssens has counterclaimed against Freedom for malicious use of civil proceedings under 42 Pa. C.S.A. §§ 8351-8355, known as the "Dragonetti Act," and for abuse of process under common law.[5]  "The statute, on its face, requires that this proceeding terminate in favor of defendants before defendants' claim for wrongful use of civil proceedings is ripe for adjudication." *Linker v. Custom-Bilt Machinery, Inc*., 594 F. Supp. 894, 902 (E.D. Pa. 1984).  As indicated previously, none of the issues raised by Freedom in this adversary proceeding had been actually determined before the

---

[5]The Dragonetti Act provides, as follows:

(a) Elements of action.-A person who takes part in the procurement, initiation or continuation of civil proceedings against another is subject to liability to the other for wrongful use of civil proceedings [if]:

(1) He acts in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties or adjudication of the claim in which the proceedings are based; and

(2) The proceedings have terminated in favor of the person against whom they are brought.

42 Pa. C.S.A. §8351 (1980).

28

instant complaint was filed.  Therefore, the claim of malicious use of civil proceedings pursuant to the Dragonetti Act is not ripe for adjudication.

9.  Janssens' assertion that Freedom has abused the civil process is without merit. "The tort of abuse of process occurs when a party has 'wilfully misused criminal or civil process' against another party for a purpose different than the proceeding's intended purpose and thereby caused that party damage (e.g., arrest, seizure of property, economic injury)."  *State v. Rendelman,* 404 Md. 500, 518, 947 A.2d 546, 556 (Md. 2008) (quoting *Krashes v. White*, 275 Md. 549, 555, 341 A.2d 798, 802 (Md. 1975)). *See also One Thousand Fleet Ltd. Partnership v. Guerriero*, 346 Md. 29, 694 A.2d 952 (Md. 1997). Abuse of process is, "the use of the legal process as a tactical weapon to coerce a desired result that is not the legitimate object of the process..." *McGee v. Feege*, 517 Pa. 247, 259, 535 A.2d 1020, 1026 (Pa. 1987). "[T]he tort of abuse of process is concerned with a perversion of the legal process." *Id.*

10.  Janssens has not demonstrated any abuse by Freedom of the legal process. Freedom possesses legitimate claims against Janssens for his diversion of corporate opportunities and his misuse of proprietary information.  Were this Court to admit evidence of settlement negotiations as requested by Janssens, it would not affect the outcome.  Section 523 of the Bankruptcy Code is available to Freedom as Janssens' aggrieved former employer.

29

## IMPOSSIBILITY AND IMPRACTICABILITY OF PERFORMANCE

11.  The defense of legal impossibility of performance is defined in Section 261 of the Restatement (Second) of Contracts (1981): "Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary." *Id*.  "A thing is impossible in legal contemplation when it is not practicable; and a thing is impracticable  when it can only be done at an excessive and unreasonable cost." *Opera Co. of Boston, Inc. v. Wolf Trap Found. for Performing Arts*, 817 F.2d 1094, 1100 (4th Cir. 1987) (quoting *Transatlantic Fin. Corp. v. United States,* 363 F.2d 312, 315 (D.C. Cir. 1966)).  "[A] party relying on the defense of impossibility of performance must establish (1) the unexpected occurrence of an intervening act, (2) such occurrence was of such a character that its non-occurrence was a basic assumption of the agreement of the parties, and (3) that occurrence made performance impracticable. When all those facts are established the defense is made out." *Opera Co. of Boston, Inc.*, 817 F.2d at 1102.

12.  Janssens raised the affirmative defense that his performance under the employment contract was impossible or impracticable as a result of the mismanagement of Freedom and the implementation of Freedom's new business model.  However,

Janssens has not carried his burden of proof in this regard. He has pointed to no intervening cause or event that rendered his performance either impossible or impracticable. The assertion that he moonlighted because Freedom was unable or unwilling to make certain sales was not believable. Janssens never provided any proof that he was unable to perform his duties under his agreements with Freedom, that Freedom did not have the equipment required to satisfy its customers' needs or that Freedom was unable to service its customers' equipment. The alleged mismanagement of Freedom did not prevent or excuse Janssens from performing his duties to Freedom.[6] The preponderance of the evidence demonstrates that Freedom's inventory included medical equipment that was available for rent and sale that Freedom's customers desired and that Freedom employed trained personnel who were able to service the equipment. Janssens' motivation to sell the medical equipment of other companies to Freedom's customers was his desire to receive higher commissions from Freedom's competitors.

## UNCLEAN HANDS DOCTRINE

13. The purpose of the unclean hands doctrine is to prevent a court from aiding or abetting a party in the commission of a fraud or other misconduct. "The primary

---

[6] The evidence shows that Janssens made his work more difficult to perform by not following corporate procedures for acquiring rental equipment and by not taking advantage of the assistance that Gwynn and Greco offered.

31

principle guiding application of the unclean hands doctrine is that the alleged inequitable conduct must be connected, *i.e.*, have a relationship, to the matters before the court for resolution. We will not refuse relief to a party merely because it has engaged in misconduct which is unrelated to its claims before the court." *New Valley Corp. v. Corporate Prop. Assocs. 2 & 3 (In re New Valley Corp.)*, 181 F.3d 517, 525 (3d Cir. 1999).

14.  Nothing in the record indicates that Freedom committed fraud or inequitable conduct when it attempted to cajole testimony from Janssens regarding former employees of Freedom.  On the contrary, Freedom was within its rights to file suit and discuss settlement options with him, in the justifiable belief that he was engaged in improper dealings with other Freedom employees and with Freedom's competitors. Accordingly, Freedom is not barred from prosecuting the instant adversary proceeding by the application of the unclean hands doctrine.

## DEFAMATION, TORTIOUS INTERFERENCE, BREACH OF CONTRACT AND COVENANTS OF GOOD FAITH AND FAIR DEALING

15.  Janssens did not produce any evidence to support his counterclaims for defamation, tortious interference with business relations, breach of contract and the covenant of good faith and fair dealing, and, accordingly, they must be denied.

32

## DETERMINATION OF THE AMOUNT AND NONDISCHARGEABILITY OF DEBT BY THE BANKRUPTCY COURT IN THE ABSENCE OF A PREPETITION STATE COURT JUDGMENT

16.  The instant complaint alleged that the debt owed by Janssens to Freedom is nondischargeable pursuant to Sections 523(a)(2)(A), (a)(4), and (a)(6) of the U.S. Bankruptcy Code.[7]

---

[7]Sections 523(a)(2), (a)(4) and (a) (6) provides, as follows:

### Section 523. Exceptions to discharge.

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–

  *    *    *

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by–

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

  *    *    *

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

  *    *    *

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

11 U.S.C. §§ 523(a)(2)(A), (a)(4) and (a)(6).

17.  In order for a debt to be held nondischargeable in bankruptcy, the debt must arise from the debtor's commission of an intentional tort rather than from a mere breach of contract.  *See, e.g., Spinoso v. Heilman (In re Heilman)*, 241 B.R. 137, 172 (Bankr. D. Md. 1999).

18.  Where a judgment has been entered against a debtor who later files a Chapter 7 bankruptcy petition, the nature and amount of the prepetition judgment may supply the basis for the judgment holder to successfully prosecute a complaint in the bankruptcy court based upon the doctrines of collateral estoppel and/or *res judicata*. *Cf. McClendon*, 415 B.R. at 181 (holding that prepetition default judgment against debtor would not be given preclusive effect because necessary elements required for a determination of nondischargeability were not litigated in the earlier proceeding).

19.  In the absence of such a prepetition judgment, as here, the bankruptcy court has subject matter jurisdiction in the first instance to determine both the existence and the amount of the debt, and in the second instance, to decide whether the debt found to exist is dischargeable or nondischargeable.  *Drummond v. Freeland (In re Freeland)*, 360 B.R. 108, 129 (Bankr. D. Md. 2006); *Digital Commerce, Ltd. v. Sullivan (In re Sullivan)*, 305 B.R. 809, 821 (Bankr. W.D. Mich. 2004) ("In a nondischargeable debt action, it is permissible for a bankruptcy court to determine whether a debt exists and, if necessary, the amount of the debt," citing *Longo v. McLaren (In re McLaren)*, 3 F.3d

34

958, 965-966 (6th Cir. 1993)); *Snyder v. Devitt (In re Devitt)*, 126 B.R. 212, 215-16 (Bankr. D. Md. 1991).[8]

20.  In determining the existence and the amount of the debt, the bankruptcy court is required to apply the relevant State law according to which the debt arose.  *Grogan*, 498 U.S. at 283-84, 111 S.Ct. at 657, 112 L. Ed.2d at 763 (1991) ("The validity of a creditor's claim is determined by rules of state law."), citing *Vanston Bondholders Prot. Comm. v. Green*, 329 U.S. 156, 161, 67 S.Ct. 237, 239, 91 L. Ed. 162 (1946).

## CHOICE OF LAW[9]

---

[8]Freedom subscribed to these very propositions in its Post-Trial Brief, as follows:

> Plaintiff urges this Court to enter not only a judgment of nondischargeability in the amount of the sum of lost profits and the money paid to Mr. Janssens under false pretenses and due to his misrepresentations ($743,870), as well as attorney's fees and costs. Plaintiff believes there is substantial case law supporting this court's authority to enter a money judgment in Plaintiff's favor in this amount. Notions of judicial economy and the inherent equitable power of bankruptcy courts have been cited as logical grounds for the bankruptcy court to have authority to enter a money judgment in an amount equal to the nondischargeable amount. [citing *Cambio v. Mattera (In re Cambio)*, 353 B.R. 30 (BAP 1st Cir. 2004), and *Harris v. United States Fire Inc. Co.*, 162 B.R. 466 (E.D. Va. 1994).

Plaintiff Freedom Medical, Inc.'s Post-Trial Brief, 33-4 [P. 83].

[9]In determining a choice of law provision, Federal courts must apply the choice of law rules of the jurisdictions in which they are situated.  *In re Baltimore Emergency Servs. II*, 401 B.R. 209, 216 (Bankr. D. Md. 2008).  Maryland follows Section 187 of

21. The state law of the Commonwealth of Pennsylvania will be applied to the instant complaint to determine the validity of the plaintiff's various causes of action against the debtor that were alleged to create a nondischargeable debt in bankruptcy.[10] Freedom was incorporated under the laws of Pennsylvania and its headquarters are there. The employment agreements between Freedom and Janssens were executed in Pennsylvania and provided that its law would apply.

## CAUSES OF ACTION COGNIZABLE IN PENNSYLVANIA

22. The following causes of action cognizable in the state courts of Pennsylvania underlie the instant complaint to determine nondischargeability of debt: breach of contract, *Prudential Ins. Co. of Am. v. Stella*, 994 F. Supp. 318 (E.D. Pa. 1998); the common law torts of interference with prospective contractual relations, *Municipal Revenue Service, Inc. v. Xspand, Inc.*, ___ F. Supp.2d ___, 2010 WL 1233991 (M.D. Pa. March 31, 2010), and tortious interference with business relations, *Phillips v. Selig*,

---

the Restatement (Second) of Conflict of Laws. *Three M Enters. v. Tex. D.A.R. Enters.,* 368 F. Supp. 2d 450, 457 (D. Md. 2005); *Nat'l Glass v. J.C. Penney Properties*, 336 Md. 606, 610, 650 A.2d 246, 248 (Md. 1994). These authorities support the selection of the state law of Pennsylvania as the law applicable to the causes of action underlying the instant complaint to determine nondischargeability.

[10]The parties do not dispute that the law of Pennsylvania governs the instant complaint. The choice of law provision in Janssens' employment contract provided that Pennsylvania law governs. *See* Non-Disclosure, Non-compete, Property Rights Agreement dated August 28, 2001, Defendant's Ex. No. 2 ("This Agreement shall be construed in accordance with the laws of the Commonwealth of Pennsylvania.").

2008 PA Super. 244, P17, 959 A.2d 420, 428 (Pa. Super. Ct. 2008), *appeal denied*, 600

Pa. 764, 967 A.2d 960 (2009); *Miller Oral Surgery v. Dinello*, 416 PA Super. 310, 611

A.2d 232 (Pa. Super. Ct. 1992); breach of fiduciary duty by an employee; *Prudential*

*Ins. Co. of Am. v. Stella*, 994 F. Supp. 318 (E.D. Pa. 1998); breach by employees of an

implied duty of loyalty; *Smith v. Unemployment Comp. Bd. Of Review,* 28 Pa. Commw.

98, 101, 367 A.2d 811, 813 (Pa. Commw. Ct. 1977);[11] violation of noncompetition

clauses contained in contracts of employment, *Scobell Inc. v. Schade*, 455 PA Super.

414, 421, 688 A.2d 715, 719 (Pa. Super. Ct. 1997); embezzlement, *Sullivan v. Clayton*

*(In re Clayton)*, 198 B.R. 878, 885 (Bankr. E.D. Pa. 1996); *First Valley Bank v.*

---

[11]*Roman Sentry Sec. Sys. v. Mannino*, 25 Phila. Co. Rptr. 178, 190 (Pa. C.P. 1993), held that an employee "is not, however, entitled to solicit customers for such rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's business." *Id.* (quoting Restatement (First) of Agency § 393 comment e (1933)). *See also Reading Radio, Inc. v. Fink*, 2003 PA Super. 353, 833 A.2d 199, 211 (Pa. Super. Ct. 2003). "An employee, as an agent of his employer, is considered a fiduciary with respect to matters within the scope of his agency and is subject to a duty not to act or to agree to act during the period of his agency for persons whose interests conflict with those of the principal in matters in which the agent is employed." *Prudential Ins. Co. of Am. v. Stella*, 994 F. Supp. 318, 322 (E.D. Pa. 1998) (citing *SHV Coal, Inc.,* 376 PA Super. at 249, 545 A.2d at 920-921). In *SHV Coal, Inc.,* 376 PA Super. 241, 545 A.2d 917*,* the court held that the employee had breached his duty of loyalty by diverting corporate opportunities to his employer's competitors. *Id.* Pennsylvania courts have stated that a "[f]iduciary duty demands undivided loyalty, prohibits conflicts of interest and its breach is actionable." *Prudential Ins. Co. of Am.*, 994 F. Supp. at 322 (citing *Maritrans v. Pepper, Hamilton & Scheetz*, 529 Pa. 241, 253, 602 A.2d 1277, 1283 (Pa. 1992)).

*Ramonat (In re Ramonat)*, 82 B.R. 714 (Bankr. E.D. Pa. 1988); misappropriation and/or

disclosure of confidential information, including trade secrets, *Macbeth-Evans Glass*

*Co. v. Schnelbach*, 239 Pa. 76, 88 A. 688 (1913); diversion of corporate opportunities,

*CST, Inc. v. Mark*, 360 PA Super. 303, 520 A.2d 469 (Pa. Super. Ct. 1987); *Hill v. Hill*,

279 PA Super. 154, 160-161, 420 A.2d 1078, 1081 (Pa. Super. Ct. 1980); *Bailey v.*

*Jacobs*, 325 Pa. 187, 194, 189 A. 320, 324 (1937); and fraud and misrepresentation,

*Mirizio v. Joseph*, ___ A.2d ___, 2010 WL 1645965 (Pa. Super. Ct. 2010).

## BREACH OF CONTRACT (INCLUDING VIOLATION OF NONCOMPETITION CLAUSES IN CONTRACTS OF EMPLOYMENT)

23.  "Under Pennsylvania law, it is axiomatic that a cause of action for breach of

contract is established by showing (1) the existence of a contract to which plaintiff and

defendant were parties; (2) the essential terms of the contract; (3) a breach of the duty

imposed by the contract and (4) that damages resulted from the breach," *Prudential Ins.*

*Co. of Am. v. Stella*, 994 F. Supp. 318, 321-22 (E.D. Pa. 1998), citing *Electron Energy*

*Corp. v. Short*, 408 PA Super. 563, 597 A.2d 175 (Pa. Super. Ct. 1991), *aff'd. w/o*

*opinion*, 533 Pa. 66, 618 A.2d 395 (1993); *General State Authority v. Coleman Cable*

*& Wire Co.*, 27 Pa. Commw. 385, 365 A.2d 1347 (Pa. Commw. Ct. 1976).  Ordinarily,

while allegations that a debtor breached a contract alone will not give rise to a claim of

nondischargeable debt in bankruptcy, an exception to this rule exists where such a

breach is accompanied by allegations of the debtor's commission of fraud, misrepresentation, or other tortious misconduct.  Where a party to a contract violates his or her fiduciary duties to the other party, the resulting breach of contract may also amount to the commission of a tort.  As this opinion holds *infra*, Janssens' breach of his employment contract with Freedom was accompanied by tortious conduct that amounted to fraud, misrepresentation and breach of fiduciary duties to the plaintiff, such circumstances that justify a finding of nondischargeability.

## TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS[12]

---

[12]Comment *c* to Section 766B of the Restatement (Second) of Torts (1979), Intentional Interference with Prospective Contractual Relation, provides, as follows:

*c. Type of relation.*  The relations protected against intentional interference by the rule stated in this Section include any prospective contractual relations, except those leading to contracts to marry (see § 698), if the potential contract would be of pecuniary value to the plaintiff.  Included are interferences with the [prospect of obtaining employment or employees, the opportunity of selling or buying land or chattels or services, and any other relations leading to potentially profitable contracts.  Interference with the exercise by a third party of an option to renew or extend a contract with the plaintiff is also included.  Also included is interference with a continuing business or other customary relationship not amounting to a formal contract.  In many respects, a contract terminable at will is closely analogous to the relationship covered by this Section.  (See § 766, Comment *g* and § 768, Comment *i*).

The expression, prospective contractual relation, is not used in this Section in a strict, technical sense.  It is not necessary that the

24.  In Pennsylvania, the following four elements must be proven in order to establish interference with a prospective contractual relation: "(1) a prospective contractual relation; (2) the purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage resulting from the defendant's conduct." *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 208, 412 A.2d 466, 471 (1979).  *See also Phillips v. Selig*, 2008 PA Super. 244, P17, 959 A.2d 420, 428 (Pa. Super. Ct. 2008) and *Zippertubing Co. v. Teleflex Inc.*, 757 F.2d 1401 (3d Cir. 1985). A prospective contractual relation "is something less than a contractual right, something more than a mere hope." *Thompson Coal Co.,* 488 Pa. at 209, 412 A.2d at 471.

25.  "At a minimum, reasonable certainty embraces a rough calculation that is not 'too speculative, vague or contingent' upon some unknown factor." *ATACS Corp. v. Trans World Communications, Inc.*,  155 F.3d 659, 669-670 (3d Cir. 1998) (citing *Spang & Co. v. United States Steel Corp*., 519 Pa. 14, 25, 545 A.2d 861, 866 (1988). However, damages may be awarded even if the precise amount of damages is unknown.

----

prospective relation be expected to be reduced to a formal, binding contract.  It may include prospective quasi-contractual or other restitutionary rights or even the voluntary conferring of commercial benefits in recognition of a moral obligation.

*Id*.

40

*ATACS Corp.*, 155 F.3d at 669-670 (citing *Pugh v. Holmes*, 486 Pa. 272, 297, 405 A.2d 897, 909 (1979)).  "[T]he law holds that a principal may recover when the factfinder is satisfied that but for the wrongful acts of the defendants it is reasonably probable that a contract would have been entered."  *SHV Coal, Inc. v. Continental Grain Co.*, 376 PA Super. 241, 250, 545 A.2d 917, 921 (Pa. Super. Ct. 1988), *rev'd on other grounds*, 526 Pa. 489, 587 A.2d 702 (1991) (citing *Glenn*, 441 Pa. at 480-481, 272 A.2d at 898-899).

26.  In the instant case, the plaintiff has proven only that past customers that had rented or purchased medical equipment from Freedom rented or purchased medical equipment from Quality, but not that they would have continued to rent or purchase equipment from Freedom but for the misconduct of Janssens.  While there is evidence from which this Court could infer that Janssens intended to cause harm to Freedom by the diversion of business to Freedom's competitors, and that Janssens owed to Freedom both a duty of loyalty and a duty not to compete with Freedom while he was employed there, Freedom has not submitted sufficient evidence of damages sustained as a result of Janssens' diversion of business to competitors that resulted in lost contracts of sales or rentals by prospective customers to Freedom.

### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

27.  Similarly, "[t]he necessary elements of a cause of action for interference with existing contractual relations are as follows: (1) the existence of a contractual

41

relationship between the complainant and a third party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of defendant's conduct." *Phillips*, 2008 PA Super. 244, P18, 959 A.2d 420, 428 (Pa. Super. Ct. 2008), *appeal denied*, 600 Pa. 764, 967 A.2d 960 (2009), citing Restatement (Second) of Torts § 766 (1979); *Small v. Juniata College*, 452 PA Super. 410, 417, 682 A.2d 350, 354 (Pa. Super. Ct. 1996), *appeal denied*, 689 A.2d 235 (Pa.1997); *Triffin v. Janssen*, 426 PA Super. 57, 63, 626 A.2d 571, 574 (Pa. Super. Ct. 1993), *appeal denied*, 536 Pa. 646, 639 A.2d 32 (1994).

28.  Consequential damages are allowable under Pennsylvania law for tortious interference with contractual relations. *Rigney v. Felicia*, 433 F. Supp.2d 534, 537 (E.D. Pa. 2006), citing *Temporaries, Inc. v. Krane*, 325 PA Super. 103, 111-15, 472 A.2d 668, 672-74 (Pa. Super. Ct. 1984); *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 665 (E.D. Pa. 2002); Restatement (Second) of Torts § 774A.  However, as in the case with interference with prospective contractual relations, Freedom has failed to prove that Janssens' conduct interfered with Freedom's current contracts with its customers or that it suffered actual damages as a result.  *Walnut Street Associates, Inc. v. Brokerage Concepts, Inc.*, 2009 PA Super. 191, P8, 982 A.2d 94, 98 (Pa. Super. Ct. 2009); *The York Group, Inc. v. Yorktowne Caskets, Inc.*, 2007 PA Super. 114, 924 A.2d

1234 (Pa. Super. Ct. 2007). *See also Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 482 Pa. 416, 393 A.2d 1175 (1978), *appeal dismissed and cert. denied*, 442 U.S. 907, 99 S.Ct. 2817, 61 L. Ed.2d 272 (1979).

## BREACH OF AN IMPLIED DUTY OF LOYALTY BY EMPLOYEE/AGENT

29.    An employee who breaches the duty of loyalty to an employer in Pennsylvania is liable for damages, which may include an order to repay any compensation received during the period of disloyalty. *SHV Coal, Inc.,* 376 PA Super. at  255, 545 A.2d at 924. *See also ABC Trans Nat'l Transp., Inc. v. Aeronautics Forwarders, Inc*., 90 Ill. App.3d 817, 837, 413 N.E.2d 1299, 1315 (Ill. App. Ct. 1980); *Maritime Fish Prods., Inc. v. World-Wide Fish Prods., Inc*., 100 A.D.2d 81, 88, 474 N.Y.S.2d 281, 285 (N.Y. App. Div. 1984).

## BREACH OF FIDUCIARY DUTY BY AN EMPLOYEE

30.  Pennsylvania implies a duty of an employee to act in the best interests of his or her employer. *Reading Radio, Inc. v. Fink*, 2003 PA Super. 353, 833 A.2d 199 (Pa. Super. Ct. 2003) (former employee of radio station who during his employment recruited other employees to work for employer's competition breached his fiduciary duty of loyalty to employer); *Prudential Ins. Co. of America v. Stella*, 994 F. Supp. 318, 322 (E.D. Pa. 1998) (an agent employed by an insurance company was "a fiduciary with respect to matters within the scope of his agency and is subject to a duty not to act or

to agree to act during the period of his agency for persons whose interests conflict with those of the principal in matters in which the agent is employed").[13]

31.  As manager of Freedom's Baltimore branch, Janssens held a management position in the nature of that of a corporate officer, in which he owed a fiduciary duty to Freedom.  *See Higgins v. Shenango Pottery Co.*, 279 F.2d 46, 52 (3rd Cir. 1960) ("Officers and directors are deemed, by the law of Pennsylvania which controls, to stand in a fiduciary relation to the corporation," citing 15 P.S. § 2852-408).  Therefore, even in the absence of the Non-disclosure Agreement, Janssens was prohibited from serving the interests of his employer's competitors while he was employed by Freedom. When he executed sales or rental agreements for Quality and other entities, Janssens was acting contrary to the interests of Freedom.

32.  With respect to his claim that he was justified in selling medical equipment to Quality, Janssens' testimony lacks credibility.  His purpose in diverting sales and rentals from Freedom was to receive larger commissions from Quality.  Under his employment agreements with Freedom as construed under the law of Pennsylvania,

---

[13]"Michigan common law imposes a fiduciary duty of loyalty on all employees of a corporation that forbids them from taking action contrary to the interests of their employers."  *Digital Commerce, Ltd. v. Sullivan (In re Sullivan)*, 305 B.R. 809 (Bankr. W.D. Mich. 2004), citing *Clark & Gregory, Inc. v. Hanson (In re Hanson)*, 225 B.R. 366, 375 (Bankr. W.D. Mich. 1998), quoting Restatement (Second) of Agency § 387 (1958).  As noted throughout this opinion, Pennsylvania law follows the Restatement.

Janssens' was prohibited from serving Freedom's competitors and in so doing Janssens violated his duty of loyalty to Freedom.

33.  It is undisputed that Janssens began transacting sales and rentals of medical equipment for Quality in March 2004, in violation of his duties to Freedom, which violations continued through his termination by Freedom in April 2006.  Quality Medical Group sales reports produced by Janssens in Suit No. 1, Plaintiff's Ex. Nos. 4-11, 4-12 and 5; and Janssens' Commission payment records of Quality Medical Group and Quality Medical South produced by Janssens in Suit No. 1, Plaintiff's Ex. No. 6.

## VIOLATION OF NONCOMPETITION CLAUSES
## IN EMPLOYMENT CONTRACTS

34.  Pennsylvania courts have enforced by injunction restrictive covenants against post-employment competition contained in employment contracts if the covenants were reasonable.  *West Penn Specialty MSO, Inc. v. Nolan*, 1999 PA Super 218, 737 A.2d 295 (Pa. Super. Ct. 1999).

## EMBEZZLEMENT

35.  The meaning of embezzlement was discussed by the U.S. Bankruptcy Court for the Eastern District of Pennsylvania as follows, in *First Valley Bank v. Ramonat (In re Ramonat)*, 82 B.R. 714 (Bankr. E.D. Pa. 1988):

"Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come."  3 Collier

45

on Bankruptcy, para. 523.14[3], p. 523-107 (15th ed. 1983), cited in *In re Fains*, 37

B.R. 539, 543 (Bankr. Pa. 1984).  *See also Moore v. United States*, 160 U.S. 268, 269,

16 S.Ct. 294, 295, 40 L. Ed. 422 (1895).  Black's Law Dictionary has defined "entrust,"

a term that figures prominently in all case law definitions of "embezzlement":

> To give over to another something after a relation of confidence has
> been established.  To deliver to another something in trust or to commit
> something to another with a certain confidence regarding his care, use or
> disposal of it.  *Black's Law Dictionary* 478 (5th ed. 1979).

*Id*.  In *Sullivan v. Clayton (In re Clayton)*, 198 B.R. 878, 885 (Bankr. E.D. Pa. 1996),

it was held that embezzlement requires a showing that "(1) the debtor appropriated [the

subject] funds for his or her own benefit; and (2) the debtor did so with fraudulent intent

or deceit," quoting *In the Matter of Weber*, 892 F.2d 534, 538 (7th Cir.1989)).

## DIVERSION OF CORPORATE OPPORTUNITIES

36.  The diversion of corporate opportunities by a corporate officer or director is

actionable in Pennsylvania.  *Bernstein v. Donaldson (In re Insulfoams, Inc.)*, 184 B.R.

694, 703 (Bankr. W.D. Pa. 1995), *aff'd*, 104 F.3d 547 (3d Cir.1997)); *Bernstein v.

Gailey (In re Gailey, Inc.)*, 119 B.R. 504, 512 (Bankr. W.D. Pa. 1990); *CST, Inc. v.

Mark*, 360 PA Super. 303, 520 A.2d 469 (Pa. Super. Ct. 1987); *Lutherland, Inc. v.

Dahlen*, 357 Pa. 143, 53 A.2d 143 (1947).

46

## MISAPPROPRIATION AND/OR DISCLOSURE BY EMPLOYEES OF CONFIDENTIAL INFORMATION, INCLUDING TRADE SECRETS

37.  Freedom has alleged that Janssens violated his duties under the employment agreements by using confidential information, including trade secrets,[14] other than in the service of Freedom while he was employed as branch manager.  While this Court will hold Janssens liable for his misuse of Freedom's propriety information, it also holds that such information did not amount to trade secrets.

## FRAUDULENT MISREPRESENTATION

38.  Freedom claimed that Janssens was guilty of fraudulent misrepresentation and actual fraud when he failed to disclose his outside employment with Quality and also when he affirmatively misstated the truth to Gwynn and Greco regarding his employment.

_____

[14]In *Prudential Ins. Co. of America v. Stella*, 994 F. Supp. 318 (E.D. Pa. 1998), the court announced that "Pennsylvania courts have adopted the definition of trade secret found in comment *b* to the Restatement of Torts § 757 (1939), which provides, in pertinent part: A trade secret may consist of any formula, pattern, devise or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it."

39.   Freedom, through its principals, was justified in relying upon Janssens' misstatements because he was a trusted employee upon whom the employment agreements imposed fiduciary duties of loyalty and confidentiality.[15]

## PROOF OF DAMAGES[16]

---

[15]*Cf. Toy v. Metropolitan Life Insurance Co.*, 593 Pa. 20, 54, 928 A.2d 186, 207-08 (2007), the Supreme Court of Pennsylvania stated:

> [T]he recipient of an allegedly fraudulent misrepresentation is under no duty to investigate its falsity in order to justifiably rely, but . . . he is not justified in relying upon the truth of an allegedly fraudulent misrepresentation if he knows it to be false or if its falsity is obvious.

*Id.,* citing *Merritz v. Circelli*, 361 Pa. 239, 242, 64 A.2d 796, 798 (1949) and the Restatement (First) of Torts § 540.

[16]Section 774A(1) of the Restatement (Second) of Torts (1979), provides as follows:

### Damages

(1)  One who is liable to another for interference with a contract or prospective contractual relation is liable for damages for

(a)  the pecuniary loss of the benefits of the contract or the prospective relation;

(b)  consequential losses for which the interference is a legal cause; and

(c)  emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference.

*Id*.

48

40.  In its Post-Trial Brief, Freedom asserted that it suffered damages as a result of Janssens' misconduct in the total amount of $743,670.98, as follows:

> This consists of (i) its lost profits from the misappropriated Confidential Information and related business opportunities diverted by Janssens, which amounts to $536,880.14 and (ii) all other money that Janssens obtained by means of his false pretenses and misrepresentations, which amounts to at least $206,790.84.  If the Court finds that Mr. Janssens did not engage in a misrepresentation until his first face to face meeting with Greco and Gwynn on March 3, 2005, then it should reduce this second category of damages by the amount of Mr. Janssens' W-2 gross compensation less taxes for 2004 and should reduce the 2005 portion of this category of damages by 1/6th, representing what he received during the two months in 2005 before he made his misrepresentations to Gwynn and Greco.  (iii) A third category of damages is Freedom Medical's attorney's fees and costs, which it estimates to amount to $100,000, as well as an award of punitive damages to be determined by the Court.

Plaintiff Freedom Medical, Inc.'s Post-Trial Brief, 32-3 [P. 83] filed July 17, 2009.

41.  In *Miller Oral Surgery*, 416 PA Super. 310, 611 A.2d 232, 236-37 (Pa. Super. Ct. 1992), the Pennsylvania Superior Court set forth the rule regarding certainty of damages:

> The determination of damages is a factual issue to be decided by the fact finder.  *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa. Super. 90, 117, 464 A.2d 1243, 1257 (1983).  The burden of proving such damages is on the plaintiff.  *Spang & Co. v. U.S. Steel Corp.*, 519 Pa. 14, 25, 545 A.2d 861, 866 (1988).  "As a general rule, damages are not recoverable if they are too speculative, vague or contingent and are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty."  *Id*. at 25-26, 545 A.2d at 866. However,

49

recovery will not be precluded simply because there is some uncertainty as to the precise amount of damages incurred. It is well established that mere uncertainty as to the amount of damages will not bar recovery where it is clear that damages were the certain result of the defendant's conduct.... The basis for this rule is that the breaching party should not be allowed to shift the loss to the injured party when damages, even if uncertain in amount, were certainly the responsibility of the party in breach.... (citations omitted).

*Id.*, citing *Pugh v. Holmes*, 486 Pa. 272, 297, 405 A.2d 897, 909-910 (1979).

42. The absence of evidence supplying a basis to conclude that Freedom's past customers would have continued to purchase or rent medical equipment from Freedom renders impossible a determination of the probability that Freedom would have benefitted from the sales contracts executed by Janssens.[17] The testimony of Wenzel

_____

[17]In *Phillips v. Selig*, 2008 PA Super. 244, P20, 959 A.2d at 428-29, the Pennsylvania Superior Court stated:

In determining the "reasonable likelihood or probability" of a prospective contractual relationship, courts must apply an objective standard. *Thompson Coal Co.*, 488 Pa. at 209, 412 A.2d at 471. In so doing, Pennsylvania courts have consistently required more evidence than the existence of a current business or contractual relationship. In *Thompson Coal Co.*, for example, the Supreme Court declined to find a prospective contractual relationship based on evidence that the parties had renewed a year-to-year lease for mineral rights for ten consecutive years. *Id.* at 210, 412 A.2d at 472. Likewise, in *Strickland [v. University of Scranton*, 700 A.2d 979] this Court refused to acknowledge a prospective contractual relationship when a university administrator's contract was not renewed after almost twenty-five years on the job. *Strickland*, 700 A.2d at 985.

50

was offered to support the notion that Freedom possessed medical equipment available

for rent, but this testimony alone could not prove that customers would have necessarily

purchased or rented medical equipment from Freedom absent Janssens' misconduct.[18]

43. In *Osterling v. Frick*, 284 Pa. 397, 404, 131 A. 250, 251-52 (1925), a breach

of contract action, the Supreme Court of Pennsylvania stated, "While damages in such

---

In this case, Appellants argue that they had a "longstanding, uninterrupted relationship with MLUA dating back to 1979. In February 1999, a mere five months before July 1999, the overwhelming majority of umpires voted to renew and extend [Appellants'] retainer through 2003...." Appellants' Brief at 42. These points, while supported by the record, amount merely to an assumption of a *future* contractual relationship based upon evidence of an *existing* contractual relationship. As *Thompson Coal Co.* and *Strickland* demonstrate, however, this evidence alone is insufficient as a matter of law to establish a "prospective contractual relationship."

*Id.*

[18]The one exception is Freedom's proof that Janssens diverted the IMS sale worth $90,000 to Quality, contained in Finding of Fact No. 17. In *SHV Coal, Inc. v. Continental Grain Co.*, 376 PA Super. 241, 246, 545 A.2d 917, 920 (Pa. Super. Ct. 1988), *rev'd on other grounds*, 526 Pa. 489, 587 A.2d 702 (1991), a prospective customer was told by the defendant that he could not accept a purchase order on behalf of his current employer, but would accept the order on behalf of another company. *SHV Coal, Inc*. is analogous to the present case, because Janssens directed IMS to place the order with Quality instead of Freedom. It appears that had Janssens actually contacted Freedom's management, Freedom would have received the sale. Janssens directed the sale to Quality in order to receive a higher commission. Nevertheless, while Freedom established Janssens' tortious interference with the $90,000 purchase order, its failure to establish the amount of its lost profits from the sale will preclude its recovery of damages.

51

case cannot be based on a mere guess or speculation, yet, where the amount may be fairly estimated from the evidence, a recovery will be sustained even though such amount cannot be determined with entire accuracy." (Quoted in *Massachusetts Bonding & Insur. Co. v. Johnston & Harder, Inc.*, 343 Pa. 270, 22 A.2d 709 (1941)).

44. The general rule is that lost profits are recoverable upon proper proof in contract and tort cases. *Birth Center v. St. Paul Co. Inc.*, 567 Pa. 386, 405, 787 A.2d 376, 405 (2001). Freedom submitted a summary in which it purported to compute its lost profits. Freedom Medical, Inc. Lost Profits Damages Computation, Plaintiff's Ex. No. 35. The summary was based upon information contained in reports that Janssens produced in Suit No. 1 that detailed medical equipment sales and rentals by Quality for the years 2004-2006 inclusive, totaling $649,407.81. Plaintiff's Ex. Nos. 4-11, 4-12 and 5. Upon close inspection, the summary is actually a report of gross revenues received by Quality, and not lost profits suffered by Freedom. This is clear from the testimony of Eric Wenzel.

45. Wenzel testified that during the time of Janssens' employment, Freedom's gross profit on sales of medical equipment ranged from 55% to 80%.[19] Transcript, 45, lines 20-23. [P. 73]. The Court finds this testimony suspect because the plaintiff

---

[19]Wenzel also admitted on cross examination that he did not factor the payment of commissions in calculating Freedom's profit margin, which represented 10% of the gross profit.

52

presented no other evidence in support of this proposition or to indicate a standard range of profit common to industry-wide sales of medical equipment similar or identical to that sold by Freedom.  In light of this suspect testimony and in the absence of expert testimony submitted by the plaintiff, the plaintiff has failed to substantiate a proper basis for this Court to calculate the plaintiff's lost profits from the sale and rental of medical equipment diverted by Janssens, and the Court will not guess at the actual percentage of profit.[20]

## RECOVERY BY FREEDOM OF WAGES PAID TO JANSSENS

46.  Even though Freedom has failed to prove that it suffered damages by reason of Janssens' diversion of sales and rentals, Freedom has proven that Janssens obtained his salary and wages from Freedom while he was competing against the interests of Freedom by spending company time in aiding its competitors.  In this connection, Freedom it is entitled to recover wages and commissions it paid to Janssens between March 1, 2004, and April 7, 2006, in the amount of $189,375.93.  Janssens breached his duty of loyalty by assisting Freedom's competition.  Freedom suffered a loss as a result of its compensating Janssens while he was working on behalf of Quality and other

---

[20]Cf. *Miller Oral Surgery*, 611 A.2d at 237-8, where $300,000 was awarded as a discovery sanction in the same amount as that claimed by the plaintiff for compensatory damages for interference with business relations.  The opinion upheld a trial court's award of damages based upon the testimony of an expert that established a sound basis for the determination of present and future profits.

vendors and renters of medical equipment. In effect, Janssens was paid for services he did not perform. Freedom would not have continued to retain Janssens as an employee had it been aware of his actions. Therefore, as a result of Janssens' disloyalty, Freedom is entitled to recover the salary paid to Janssens during this period, amounting to $189,375.93.

## PUNITIVE DAMAGES

47. Freedom requested an award of punitive damages in connection with Janssens' fraud. "In Pennsylvania, punitive damages are ordinarily not recoverable on breach of contract claims [unless] . . . the defendant's conduct gives rise to an independent tort claim. . ." *Western Essex Corp. v. Casio, Inc.*, 674 F. Supp. 8, 9 (W.D. Pa. 1987). "Punitive damages are awarded to punish a defendant for certain outrageous acts and to deter him or others from engaging in similar conduct." *Reading Radio, Inc.*, 2003 PA Super. at P43, 833 A.2d at 214 (citing *Judge Tech. Servs. v. Clancy*, 2002 PA Super. 391, P14, 813 A.2d 879, 888-889 (Pa. Super. Ct. 2002)). The factors that control whether punitive damages will be granted are "the character of the act; the nature and the extent of the harm; and the wealth of the defendant." *Id.*

48. In the instant adversary proceeding, punitive damages will not be awarded because (1) they are not necessary as a deterrence where the award of compensatory damages is substantial enough to deter Janssens and others from committing similar

54

acts; and (2) there is evidence that the debtor is insolvent and unable to satisfy even the payment of compensatory damages.

## ATTORNEYS' FEES AND COSTS

49.  Freedom requested that it be reimbursed for its attorneys' fees in prosecuting this complaint in the estimated amount of $100,000.  Janssens' agreement with Freedom entitled "Non-Disclosure, Non-compete, Property Rights Agreement" dated August 28, 2001, provided that "[i]ndividual shall reimburse Freedom Medical for all costs, fees and other expenses incurred by Freedom Medical in connection with Freedom Medical's attempt to enforce the provisions of this Agreement."  *Id.* at ¶ 4.6, Defendant's Ex. No. 2.  However, because Freedom has not submitted into evidence any documentation whatsoever regarding the fees it paid its attorneys or the costs it incurred in the prosecution of this litigation, an award for attorney fees and costs will be denied.

## BURDEN OF PROOF TO ESTABLISH NONDISCHARGEABILITY

50.  "[S]tatutory exceptions to dischargeability are narrowly construed in favor of the debtor."  *Nunnery v. Rountree (In re Rountree)*, 330 B.R. 166, 170  (E.D. Va. 2004), quoting *In re Brevard*, 200 B.R. 836, 842 (Bankr. E.D. Va. 1996), (citing *Hagan v. McNallen (In re McNallen)*, 62 F.3d 619, 625 (4th Cir. 1995); *Blackwell v. Commonwealth of Va. Dept. of Taxation*, 115 Bankr. 86, 88 (Bankr. W.D. Va. 1990))

55

(citations omitted). "Under Bankruptcy Rule 4005, the plaintiff has the burden of proof to make a debt non-dischargeable. Under § 523(a), the plaintiff must prove non-dischargeability by a preponderance of the evidence." *E.I. Hamm & Assocs., Inc. v. Sparrow (In re Sparrow)*, 306 B.R. 812, 823-24 (Bankr. E.D. Va. 2003), citing *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L. Ed.2d 755 (1991); *Farouki v. Emirates Bank Int'l., Ltd.*, 14 F.3d 244, 249 (4th Cir. 1994); *Combs v. Richardson*, 838 F.2d 112 (4th Cir. 1988); *Whitson v. Middleton (In re Middleton)*, 100 B.R. 814, 818 (Bankr. E.D. Va. 1988).

## SECTION 523(a)(2)(A)

51. To establish nondischargeability pursuant to Section 523(a)(2)(A), the plaintiff must prove "(1) a fraudulent misrepresentation; (2) that induces another to act or refrain from acting; (3) causing harm to the plaintiff; and (4) the plaintiff's justifiable reliance on the misrepresentation." *Miller v. Cigna Insur. Co.*, 311 B.R. 57, 61 (D. Md. 2004) (citing *Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 134 (4th Cir. 1999)). "One of the primary obligations of an agent to his or her principal is to disclose any information the principal reasonably may want to know." *Cigna Insur. Co.*, 311 B.R. at 61 (citing *Insurance Co. of North America v. Miller*, 362 Md. 361, 381, 765 A.2d 587, 597 (2001)).

52. Janssens' misrepresentations to Freedom date from his failure to disclose to Freedom that he was working on behalf of Freedom's competitors, the date upon which he commenced to breach his duties contained in his employment agreements with Freedom.  "A misrepresentation may exist notwithstanding the fact that the debtor did not 'affirmatively state a misrepresentation or was never asked to disclose pertinent facts.'"  *Ultra Litho, PYT, Ltd v. Moore (In re Moore)*, 365 B.R. 589, 602 (Bankr. D. Md. 2007) (quoting *Household Fin. Corp. v. Kahler (In re Kahler)*, 187 B.R. 508, 512 (Bankr. E.D. Va. 1995)).  "Bankruptcy courts have overwhelmingly held that a debtor's silence regarding material fact can constitute a false representation actionable under section 523(a)(2)(A)."  *Wolstein v. Docteroff (In re Docteroff)*, 133 F.3d 210, 216 (3d Cir. 1997) (holding that a debtor's failure to disclose material facts amounted to fraud under Section 523(a)(2)(A), quoting *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1288 (8th Cir. 1987)).  In the instant case, Janssens' silence led Freedom to believe that he was dutifully serving Freedom, instead of working against its interests by diverting corporate opportunities to its competitors.  Janssens' failure to disclose his violation of his duties to Freedom became an affirmative misrepresentation when he lied to Gwynn and Greco that he was not engaged in work outside the business.  Janssens knew this representation to be false because at the time he made it, he was obtaining sales and rentals for Freedom's competitors.

57

53.  Freedom has established that Janssens' omission or misrepresentation was made with the intent to deceive.  "Intent to deceive may be inferred by the circumstances, including whether the defendant knowingly or recklessly made false representations, which she should know would induce the plaintiff to rely on them." *Guaranty Residential Lending, Inc.*, 334 B.R. 364, 372 (Bankr. D. Md. 2005) (citing *Kendrick v. Pleasants (In re Pleasants)*, 231 B.R. 893, 898 (Bankr. E.D. Va. 1999)). Janssens' intention to deceive Freedom regarding his diversion of corporate business may be inferred from his desire to receive larger commissions from Freedom's competitors.  He was aware that Gwynn and Greco would not have approved of his conduct or agreed with his assessment that such conduct was permissible or justified.

54.  Freedom justifiably relied on Janssens' misrepresentations.  "[J]ustifiable reliance is the standard applicable to a victim's conduct in cases of alleged misrepresentation and that '[i]t is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own.'" *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L. Ed.2d 351 (1995) (quoting W. Prosser, Law of  Torts § 108, p. 718 (4th ed.1971)).  Justifiable reliance is a subjective standard that takes into account the relationship of the parties.  Gwynn and Greco's reliance was justifiable because they

asked Janssens twice about his outside activities and on both occasions Janssens answered in the negative. Because other branches in addition to the Baltimore branch that Janssens managed were also experiencing declining revenue, there was no reason for Gwynn and Greco to know that Janssens was deceiving them or that they needed to investigate the matter further.

55. The plaintiff must show that harm resulted as a proximate cause of the misrepresentation. "Proximate cause is both (1) causation in fact, 'loss suffered by one who justifiably relies upon the trust of the matter misrepresented, if his reliance is a substantial factor in determining the course of conduct that results in his loss;' and (2) legal causation, 'if the loss might reasonably be expected to occur from the reliance.'" *Elrod v. Bowden (In re Bowden)*, 326 B.R. 62, 89 (Bankr. E.D. Va. 2005) (quoting *KMK Factoring, L.L.C. v. McKnew (In re McKnew)*, 270 B.R. 593, 622 (Bankr. E.D. Va. 2001)) (citing Restatement (Second) of Torts § 546, 584A (1976)). It is undisputed that Janssens began diverting sales to Quality Group and Quality South in March 2004. Between March 1, 2004, and April 7, 2006, Freedom paid Janssens $189,375.93 for his services. Freedom suffered a loss as a result of paying Janssens for services he was not performing. Janssens used his continued employment by Freedom to access and misuse its proprietary information against Freedom's interests while misrepresenting the fact to Freedom.

## SECTION 523(a)(4)

56.  To establish nondischargeability of debt pursuant to Section 523(a)(4), Freedom must establish proof of Janssens' "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" by a preponderance of the evidence.  11 U.S.C. § 523(a)(4).

57.  Regardless of whether state law would hold a particular relation to be one giving rise to a fiduciary duty, Federal bankruptcy law determines whether a debtor was acting as a fiduciary in any given fact situation for purposes of finding a debt to be nondischargeable for breach of fiduciary duty.  Applying Federal bankruptcy law, the ordinary relationship between and employer and an employee does not give rise to a fiduciary relationship for purposes of nondischargeability of debt in bankruptcy.  *Solar Systems and Peripherals, Inc. v. Burress (In re Burress)*, 245 B.R. 871, 877 (Bankr. D. Colo. 2000).  In order to establish the existence of a fiduciary relationship, the plaintiff must show the establishment of an express or technical trust, and not one implied in law; or at the very least, that the debtor was a person in holding a position "of ultimate trust, such as public officers, executors, administrators, guardians, trustees of express trusts, attorneys and corporate directors."  *Spinoso*, 241 B.R. at 169 (Bankr. D. Md. 1999).

60

58.  However, the position of ultimate trust that Janssens held as branch manager, which is likened to that of a corporate officer, when coupled with the provisions of his employment contract which designated him as a "key employee" and imposed confidential duties upon him in the use of highly sensitive confidential information, created a fiduciary relationship in fact as well as in law.  Therefore, this Court finds that Janssens was such a fiduciary for bankruptcy purposes and that he violated his fiduciary duties to his employer contained in his employment agreements.[21]

59.  Notwithstanding the absence of a fiduciary relationship, a debt may yet be determined to be nondischargeable pursuant to Section 523(a)(4) where, as here, the plaintiff has proven that the debtor committed embezzlement.  *Teamsters Local 533 v. Schultz (In re Schultz)*, 46 B.R. 880, 889 (Bankr. D. Nev. 1985).  *See also  Applegate v. Shuler (In re Shuler),* 21 B.R. 643 (Bankr. D. Idaho 1982); *Ford Motor Credit Co. v. Talcott (In re Talcott)*, 29 B.R. 874, 878 (Bankr. D. Kan. 1983).  Janssens' diversion of corporate opportunity and his use of insider information and the resulting benefit to

---

[21]While the debtor and the plaintiff were indeed parties engaged in a commercial relationship, Janssens was essentially a trustee of an actual trust created by his employment contracts with Freedom which predated his violation of his fiduciary duties set forth in the contracts.

himself and detriment to Freedom amounted to embezzlement, giving rise to a nondischargeable debt.[22]

60.  Janssens was entrusted with Freedom's proprietary information, including its customer lists and inventory.[23]

## SECTION 523(a)(6)

61.  Janssens' diversion of corporate opportunities and interference with Freedom's contractual relations were intentional torts that were committed with his avowed knowledge that their commission would injure his employer.[24]  Whether

---

[22]Embezzlement is "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Spinoso*, 241 B.R. at 171 (Bankr. D. Md. 1999) (quoting *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-1173 (6th Cir. 1996).  In *Rolley v. Spector (In re Spector)*, 133 B.R. 733, 742 (Bankr. E.D. Pa. 1991), it was held that a managing partner's conversion of funds amounted to embezzlement and was therefore nondischargeable pursuant to Section 523(a)(4).  Janssens misuse of Freedom's trade secrets, including its customer lists and contacts to further his own interests and those of Freedom's competitors, amounted to embezzlement.  *Contra*, *Weidle Corp. v. Leist (In re Leist)*, 398 B.R. 595 (Bankr. S.D. Ohio 2008) (applying Ohio law).

[23]Janssens' employment agreement defined client information and contacts as proprietary information that was not to be used for other than corporate purposes.  Janssens used Freedom's proprietary information without its permission for his personal gain in a manner that was prejudicial to Freedom.  *Cf. KV Pharm. Co. v. Harland (In re Harland)*, 235 B.R. 769 (Bankr. E.D. Pa. 1999) (debtor entrusted with employer's books and trade secrets and used them for his own financial benefit was held liable to the employer for nondischargeable debt based upon embezzlement).

[24]In order to except a debt from discharge pursuant to Section 523(a)(6), the plaintiff must demonstrate by a preponderance of the evidence that the debtor's conduct was willful and malicious.  *Grogan v. Garner*, 498 U.S. 279, 286-87, 111

62

Janssens actually intended to cause financial harm to Freedom when he diverted its business is not the issue; rather, it is the fact that Janssens knew that financial harm would result to Freedom as a natural consequence of his intentional acts. *See Traditional Indus., Inc. v. Ketaner (In re Ketaner)*, 149 B.R. 395 (Bankr. E.D. Va. 1992); *Viener v. Jacobs (In re Jacobs)*, 381 B.R. 128 (Bankr. E.D. Pa. 2008).

62.  Janssens' conduct was willful because he deliberately conducted sales on behalf of Freedom's competitors while he was employed by Freedom. The requirement of malice for the debt to Freedom to be nondischargeable is present because Janssens provided no justification for his conduct. Support for the finding that Janssens knew that his conduct was harmful to Freedom is inferred from his misrepresentations to Gwynn and Greco that he was not working against Freedom's interests when he denied

---

S.Ct. 654, 659-660, 112 L. Ed.2d 755 (1991). In *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L. Ed.2d 90 (1998), the Supreme Court defined the term "willful" to means a "deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." 523 U.S. at 61, 118 S.Ct. at 977. A malicious and willful injury is a deliberate and intentional act without just cause "in knowing disregard of the rights of another." *Muse v. Day (In re Day),* 409 B.R. 337, 344 (Bankr. D. Md. 2009) (quoting *First Nat'l Bank v. Stanley (In re Stanley)*, 66 F. 3d 664, 667 (4th Cir. 1995)). "Malice can be inferred from deliberate conduct that 'necessarily produces harm or which has a substantial certainty of causing harm and is without just cause or excuse.'" *Viener v. Jacobs (In re Jacobs)*, 381 B.R. 128, 136 (Bankr. E.D. Pa. 2008) (quoting 4 COLLIER ON BANKRUPTCY ¶ 523.12[2], at 523-92.4 (15th ed. 1996) (quoted in *Printy v. Dean Witter Reynolds, Inc.,* 110 F.3d 853, 859 (1st Cir. 1997). *Citizens National Bank v. Vandergrift (In re Vandergrift),* 35 B.R. 76, 78 (Bankr. D. Md. 1983) ("Courts may assume that debtors intend the natural consequences of their acts.").

working outside of his employment by Freedom.  His concealment of the facts bolsters the conclusion that he was aware that his conduct was wrongful and violated the terms of his employment contract.[25]

*WHEREFORE*, pursuant to Sections 523(a)(2)(A), (a)(4) and (a)(6) of the United States Bankruptcy Code, a nondischargeable judgment will be entered in favor of Freedom Medical, Inc., and against Joseph J. Janssens, III, in the amount of $189,375.93.

*ORDER ACCORDINGLY*.

---

[25]In an unreported opinion, *In re Hilburn*, 2007 WL 3224575 (Bankr. D. Md. 2007), this Court (Lipp, J.) held that a debtor's usurpation of a corporate opportunity that belonged to the plaintiff was a breach of fiduciary duty under his employment agreement and Maryland common law that amounted to a non-dischargeable debt under 523(a)(6).

cc:    Charles Frederick Obrecht, Jr., Esquire
       Obrecht and Obrecht
       877 Old Baltimore-Annapolis Boulevard, Suite 101
       Severna Park, Maryland  21146

       Edward T. Kang, Esquire
       Weir & Partners, LLP
       The Widener Building, Suite 500
       1339 Chestnut Street
       Philadelphia, Pennsylvania  19107

       Gregory H. Mathews, Esquire
       1100 S. Washington Ridge
       West Chester, PA 19382

       Counsel to the Plaintiff Freedom, Inc.

       Lori S. Simpson, Esquire
       Bishop, Daneman and Simpson, LLC
       1400 South Charles Street
       Baltimore, Maryland  21230

       James P. Golden, Esquire
       Hamburg & Golden, PC
       1601 Market Street, Suite 3310
       Philadelphia, Pennsylvania 19103-1443

       James L. Lekin, Esquire
       220 Cockeysville Road
       Cockeysville, Maryland 21030

       Counsel to the Defendant Joseph W. Janssens, III

Joseph J. Bellinger, Esquire
Offit Kurman
8171 Maple Lawn Boulevard, Suite 200
Maple Lawn, Maryland   20759
Chapter 7 Trustee

Office of the United States Trustee
2625 U. S. Courthouse
101 West Lombard Street
Baltimore, Maryland 21201